## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

FUJIFILM HOLDINGS CORP.,

              Plaintiff,

              v.

XEROX CORP.,

              Defendant.

-----------------------------------------------------------------

No.

**COMPLAINT**

Plaintiff Fujifilm Holdings Corp. ("Fujifilm"), by and through its undersigned counsel, for its claims against Xerox Corp. ("Xerox") alleges the following based upon personal knowledge as to Fujifilm's own acts and upon information and belief as to all other matters.

\*     \*     \*

On January 31, 2018, the boards of directors of Fujifilm and Xerox announced that they had each unanimously agreed to a transaction (the "Transaction") that would transform their relationship, long centered around their more than 50-year-old joint venture, Fuji Xerox Co., Ltd. ("Fuji Xerox").  In that transaction, generally described, Fujifilm agreed in effect to transfer its 75 percent ownership of Fuji Xerox to Xerox, such that Fuji Xerox would become an indirect subsidiary of Xerox.  In return, Fujifilm would receive 50.1 percent of the outstanding common stock of Xerox.  Existing Xerox shareholders were to receive a one-time special cash dividend of roughly $9.80 per share (or about 30 percent of the then-current share price) and, through their continued ownership of 49.9% of Xerox, participate in future synergies and revenue generated through the combination of Xerox with Fuji Xerox.  The $2.5 billion special dividend would be funded through debt at the newly unified company.

There is no question that the directors of Fujifilm and Xerox believed that their respective approvals of the Transaction were an appropriate exercise of their fiduciary duties undertaken to maximize value for their respective shareholders.  As the Xerox board of directors (the "Xerox Board") reiterated on May 4, 2018: "the Xerox Board unanimously authorized the Transaction after months-long discussions and deliberations, and based on its good faith judgment that the Transaction represented the value-maximizing alternative for the company's shareholders."

Nevertheless, on May 13, 2018, the Xerox Board purported to terminate the Transaction—which, as the parties documented myriad times, would generate billions of dollars in synergies.  This change of heart is undoubtedly due to external pressures.  Xerox has recently been subject to the whims of activist investors Carl Icahn and Darwin Deason, who, notwithstanding their minority ownership of Xerox shares, have yanked the Xerox Board in more directions than can be counted.  This includes a game of musical chairs in the Xerox boardroom, which announced several changes to its composition in just the first two weeks of May 2018.  At present, however, undoubtedly due to Icahn's and Deason's influence, the Xerox Board has decided to attempt to back out of the Transaction, abandoning the deal its directors unanimously approved in January because they believed it would maximize value for Xerox shareholders.

But the Transaction is *also* value-enhancing for Fujifilm's shareholders and thus Fujifilm is compelled to take steps to protect its rights.  Fujifilm's board of directors and management negotiated in good faith to yield a transaction that protects a longtime joint venture, ensures access to its shared patents and ongoing research and development efforts, and will earn Fujifilm shareholders a significant return in synergies and other revenues, both immediately and over time.  While cognizant of the presence of well-known activist investor Carl Icahn and his penchant for seeking the ever-better deal, Fujifilm bargained for the right to seek damages

2

reflecting "the benefit of the bargain lost by a party's shareholders" if Xerox willfully breached the Transaction Agreements (defined herein).  Xerox has now done so several times over, thanks in no small part to Icahn and Deason's machinations.

Fujifilm's shareholders are rightly entitled to the benefit of the bargain that the Xerox Board struck.  Fujifilm, therefore, brings these claims seeking an amount to be proven at trial— well in excess of $1 billion—reflecting the value Fujifilm's shareholders would have received had Xerox fulfilled its end of the bargain, along with punitive damages for Xerox's intentional and egregious conduct.

## PARTIES AND NON-PARTIES

1. Fujifilm is a diversified global business operating in three major business areas: document solutions (office products, office printers, and related services), imaging solutions (photo imaging and optical device and electronic imaging), and healthcare & material solutions (healthcare, graphic systems and display materials).  Fujifilm is incorporated under the laws of Japan and has its principal place of business in Tokyo, Japan.  Fujifilm's common stock is publicly traded on the Tokyo stock exchange under the ticker "4901."

2. Xerox is a digital print technology company, incorporated under the laws of the State of New York.  Its principal place of business is in Norwalk, Connecticut, and Xerox's common stock is publicly traded on the New York Stock Exchange under the symbol "XRX."

3. Fuji Xerox is a non-party corporation organized under the laws of Japan that develops, manufactures, and distributes xerographic and document-related products and services in, among other places, Japan, China, Hong Kong, Australia, and New Zealand.  Fujifilm and Xerox founded Fuji Xerox in 1962.

4.      Non-Party Xerox Limited ("Xerox Ltd.") is a United Kingdom-based entity and a wholly-owned subsidiary of Xerox.  Xerox Ltd. has, since at least 2001, directly held Xerox's interest in Fuji Xerox.

5.      Non-Party Jeffrey Jacobson ("Jacobson") served as Xerox's CEO from January 1, 2017 until May 13, 2018, at which time he also resigned from the Xerox Board.

6.      Non-Parties Gregory Q. Brown, Joseph J. Echevarria, William Curt Hunter, Robert J. Keegan, Cheryl Gordon Krongard, Charles Prince, Ann N. Reese, Stephen H. Rusckowski, and Sara Martinez Tucker (collectively, and together with Jacobson, the "Directors"), were each members of the Xerox Board who, along with Jacobson, unanimously approved the transaction with Fujifilm that was memorialized in the contracts at issue in this litigation.

7.      Non-Party Darwin Deason ("Deason") purports to be the third-largest shareholder of Xerox and is currently the plaintiff in a pending litigation before the New York Supreme Court in which he sought, among other things, to permanently enjoin the Transaction alleging it is not fair to Xerox shareholders.  *See Darwin Deason v. Fujifilm Holdings Corp., et al.*, Index No. 650675/2018 (N.Y. Sup. Ct.).  As is discussed below, Deason has since moved to discontinue that litigation as to Xerox and its directors.

8.      Deason's relationship with Xerox dates back to at least 2009.  Deason was the founder of Affiliated Computer Services, Inc. ("ACS") and owned a substantial stake in ACS until Xerox purchased it in 2009 for $6.4 billion.  Ironically, ACS shareholders sued Deason after the ACS-Xerox transaction was announced because Deason was paid roughly 50 percent more for his shares than were ACS's other common shareholders.

9.      Non-Party Carl Icahn ("Icahn") is an activist investor and the founder and controller of Icahn Enterprises L.P., a conglomerate holding company based in New York, New York.  Icahn is well known for various "corporate raider" and activist investments.  This includes a recent investment and divestment in Herbalife Nutrition.  In November 2015, certain of Icahn's affiliates filed a Schedule 13D beneficial ownership report with the U.S. Securities and Exchange Commission (the "SEC") disclosing a roughly 7 percent investment in Xerox common stock and soon announced a push for Xerox to break itself up into separate entities.  Public filings in Deason's state court litigation reveal that Icahn is helping fund that litigation.

10.     Icahn and Deason are currently (and have been for some unknown period of time) acting together as a group with respect to Xerox.  Upon information and belief, that period of time includes a period in which Regulation 13D under the Securities Exchange Act of 1934 required them to disclose publicly that they had formed such a group, but did not do so.

11.     Non-Party Jonathan Christodoro ("Christodoro") is, upon information and belief, a managing director of Icahn Capital, L.P., an entity through which Icahn manages investment funds.  On June 27, 2016, Christodoro joined the Xerox Board as Icahn's designee pursuant to a standstill agreement Icahn entered with Xerox.  On December 8, 2017, Christodoro resigned from the Xerox Board.  Christodoro has served on other corporate boards as Icahn's nominated or designated director; for example, he currently serves on the Herbalife Nutrition board of directors.

**JURISDICTION AND VENUE**

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

13.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because Xerox is incorporated in the State of New York, transacts business in this District, and many of the events and omissions giving rise to the claims asserted herein occurred in this District.  Further, Xerox expressly consented to venue in this District in the Transaction Agreements.

14.     This Court has personal jurisdiction over Xerox because it is incorporated in the State of New York, has engaged in activities in New York relating to the events at issue herein, or directly and/or through affiliates conducts continuous and systematic business in New York. Further, Xerox expressly consented to jurisdiction in this District in the Transaction Agreements.

**FACTUAL BACKGROUND**

15.     On January 31, 2018, Xerox and Fujifilm announced that they had "entered into a definitive agreement to combine Xerox and their longstanding Fuji Xerox joint venture," formed in 1962.  The Transaction was the culmination of many preliminary discussions in prior years about a strategic transaction between or among Fujifilm, Xerox, and Fuji Xerox.

**2001: Fujifilm Purchases Control of Fuji Xerox**

16.     In early 2001, Xerox announced a first-quarter loss of $86 million (compared to a prior year profit of $220 million).

17.     To raise capital, in March 2001, Xerox sold half of its position in Fuji Xerox (25 percent of the shares in Fuji Xerox) for roughly $1.3 billion.  As a result of this transaction, Fujifilm obtained a controlling 75 percent stake in Fuji Xerox while Xerox retained the

remaining 25 percent through Xerox Ltd., its wholly-owned subsidiary.  Many of the terms of

this transaction were memorialized in a Joint Enterprise Contract, dated March 30, 2001 between

Fujifilm and Xerox Ltd.  Through this joint venture, among other things, Fujifilm and Xerox

retain extensive access to each other's portfolio of patents, technology, and products.

**2015: Icahn Invests in Xerox and Receives a Seat on the Xerox Board**

18.     As noted above, on November 23, 2015, Icahn disclosed that he had recently

purchased a 7.13 percent interest in Xerox through various affiliates.  That filing reflected a

belief that Xerox stock was "undervalued" and that they intended to "have discussions with

representatives" of Xerox regarding "improving operational performance and pursuing strategic

alternatives, as well as the possibility of board representation."

19.     On January 29, 2016, Icahn entered into an agreement with Xerox reflecting the

corporate change Icahn advocated.  Specifically, Xerox planned to split into two standalone

companies, essentially spinning off the services business that Xerox had recently bought from

Deason.  Icahn was granted the right to select three directors on the new company's board.

20.     On June 27, 2016, Xerox entered another agreement with Icahn affiliates—this

one, a standstill agreement related to the governance of Xerox.  In exchange for Icahn foregoing

a proxy contest, among other things, Xerox increased the size of its board by one to grant Icahn

board representation.  Icahn designated Christodoro for that seat, and Christodoro became a

member of the Xerox Board (and its corporate governance and finance committees) that same

day.

21.     On December 31, 2016, Xerox separated into two independent, publicly-traded

companies: Xerox and Conduent Incorporated.

**Xerox's New CEO and the Transaction**

22.    After the spin-off, Xerox underwent certain management and board-level changes.  For example, effective January 1, 2017, Jeffrey Jacobson became Xerox's CEO.

23.    In March 2017, Fujifilm indicated a potential interest in acquiring Xerox.  In response, Jacobson wrote Fujifilm's President and COO a letter that he noted the Xerox Board had "endorse[d]" and, among other things, requested "additional information" related to purchase price and financing.

24.    On April 20, 2017, Fujifilm announced that it formed an independent committee to review accounting practices at Fuji Xerox's New Zealand subsidiary.  Around this time, Fujifilm suspended discussions about any strategic transaction with Xerox.

25.    On June 10, 2017, Fujifilm's independent committee published a public report regarding accounting irregularities at Fuji Xerox.

26.    On July 10-11, 2017, representatives for Xerox (Jacobson and Xerox's Chief Financial Officer, Bill Osbourn) held a meeting with representatives from Fujifilm and Fuji Xerox in New York, New York (the "July Meeting").  Individuals from Xerox's financial advisor, Centerview, also attended.

27.    At the July Meeting, Jacobson conveyed that Icahn was urging a sale of Xerox to Fujifilm—and that, absent such a transaction, Icahn would exert pressure to quickly find another buyer for Xerox.  Jacobson suggested that if a sale was not agreed to by September or October 2017, Icahn would move to replace the Xerox Board and management (consistent with Xerox's December 11, 2017 deadline for director nominations).  Jacobson further expressed that Icahn

viewed the joint venture agreements relating to Fuji Xerox as making it more 'problematic' to sell to a third party other than Fujifilm.

28.     At the July Meeting, Fujifilm indicated that it would not be able to engage in a full 100 percent acquisition of Xerox at that time due to the level of Xerox's stock price.  In response, among other things, Xerox and Centerview made a revised proposal, which would become the structure of the Transaction.  Specifically, they proposed that Xerox and Fuji Xerox could merge, making Fuji Xerox a wholly-owned subsidiary of Xerox, and that Fujifilm would then purchase 50.1 percent or more of Xerox.  Fujifilm indicated at that time it would consider this proposal but also evaluate alternatives, including a transaction in conjunction with a private equity firm or acquiring a minority stake in Xerox.

29.     In subsequent discussions later in July 2017, Fujifilm indicated that one of the important elements of any transaction was not having activist investors at Xerox.  For this reason and others, Fujifilm indicated that it preferred an "outright buyout" of Xerox, while partnering with a private equity firm remained a second choice alternative.  Fujifilm conveyed, however, that it was not in a rush and would not hire any financial advisor until at least late August 2017.

30.     On September 12, 2017, representatives from Xerox, Centerview, and Fujifilm attended another in-person meeting in New York (the "September Meeting").  Attending for Xerox were Jacobson, Xerox's CFO (Bill Osbourn), and Xerox's VP for Financial Planning and Analysis (Xavier Heiss).  Fujifilm viewed the September Meeting as an opportunity to understand Icahn's recent activist efforts at Xerox and discuss how to strengthen their mutual businesses—including the ongoing discussions about Fujifilm possibly acquiring Xerox.  But Fujifilm noted that resolving issues at Fuji Xerox was its focus, rather than acquiring Xerox.  Taken together, Fujifilm indicated that, at that time (Xerox's request for speed notwithstanding),

it did not believe it could make a proposal and felt the companies could continue their discussions.

31.     Xerox representatives expressed disappointment.  They noted that Icahn continued to push for a sale of Xerox to Fujifilm, and had threatened to publish a list of his board candidates to the media by mid-November 2017 or might become a minority investor in Fujifilm and attempt to engage in activist efforts there, too.

32.     In the days immediately following the September Meeting, a Fujifilm representative received text messages from Jacobson.  The messages reflected that the Chairman of the Xerox Board, Robert Keegan, had been told about the events of the September Meeting, including that Fujifilm would likely not acquire Xerox in the immediate term.

33.     On October 18, 2017, the parties and their financial advisors (Centerview for Xerox and Morgan Stanley for Fujifilm) met to continue the preliminary discussions about a possible acquisition.  Attending for Xerox were Jacobson (CEO), Bill Osbourn (CFO), and Xavier Heiss (VP, Financial Planning and Analysis and Global Finance Shared Services).

34.     In late October 2017, both Fujifilm and Xerox learned that Fuji Xerox intended to file updated financial statements on time, but that the investigation relating to accounting irregularities was ongoing and there could be adjustments in future quarters.

35.     Around this same time, Jacobson contacted Fujifilm representatives and continued to indicate some urgency to any transaction with Xerox because of Icahn's demands.  Jacobson sought a meeting among top executives from both sides in November.  Jacobson indicated he

wanted a "solid commitment" to such a meeting, because prior meetings had been cancelled.  A meeting was set for November 14.

36.    On November 14, 2017, representatives from Xerox, Centerview, Fujifilm, and Morgan Stanley attended an in-person meeting in New York (the "November Meeting"). Attending for Xerox were Jacobson, Bill Osbourn (CFO), Xavier Hess (VP, Financial Planning and Analysis and Global Finance Shared Services), and Farooq Muzaffar (CMO).

37.    At the November Meeting, Jacobson conveyed to Fujifilm that the deadline for Icahn to nominate directors was December 11, 2017 and that Icahn's board nominee would push for his dismissal as CEO.  Fujifilm believed such a change would likely require it to continue any negotiations with a new person with whom it was not familiar.  Jacobson indicated that certain Xerox directors, including the Xerox Board Chairman, Keegan, continued to support him and that Keegan in particular wanted Fujifilm to submit a proposal before Icahn moved forward with proposals of his own.

38.    On November 25, 2017, Jacobson indicated to Fujifilm that, after consulting with Keegan, Chairman of the Xerox Board, they believed any offer from Fujifilm would have to be "substantial" in order for any negotiations to continue.

39.    Shortly thereafter, Fujifilm transmitted a preliminary term sheet outlining a plan for the Transaction.  This draft included a $2 billion special cash dividend to Xerox shareholders, which Fujifilm understood would be paid to existing Xerox shareholders, funded by debt to be repaid by the company post-transaction.

40.     On December 4, 2017, Centerview partner David Hess wrote an update to

Fujifilm executives and Morgan Stanley (Fujifilm's financial advisor), copying Jacobson and

Xerox's counsel at Paul, Weiss, Rifkind, Wharton & Garrison LLP.  He said:

> Quick update.  *We have had the first review with our full Board to ensure everyone understands the components of the proposal.  That discussion will continue, but the Board appreciates both the concept and opportunity this transaction represents.*
>
> *In the meantime, we have been authorized to engage further with you on this topic and are preparing a response to specific terms.*  We expect to have something back to you by mid-week…

41.     The next day, December 5, 2017, as Hess had promised, Centerview forwarded a

revised term sheet to Fujifilm.  The revised term sheet reflects certain Xerox counter-proposals,

including a request to increase the cash dividend to Xerox shareholders to $2.75 billion (well

above the $2 billion Fujifilm proposed).  It continued to reflect the "customary" inclusion of a

"fiduciary out" for the Xerox Board, and that the deal would be subject to approval by Xerox

shareholders.  Also unchanged by Xerox was the plan for Fujifilm and Xerox "to jointly agree on

senior management prior to signing of definitive documents," but the proposal noted that all

"[p]ost-closing, management decisions" would be "made by" the new, combined company's

board of directors.

42.     Three days later, Christodoro, Icahn's designee, resigned from the Xerox Board.

43.     In a resignation letter dated Friday December 8, 2017, Christodoro wrote that he

thought it appeared that the Xerox Board would:

> *make decisions and take Xerox in a direction with which I strongly disagree.  My resignation terminates the June 27, 2016 agreement between Xerox and the Icahn Group.*  I will be joining it and its other nominees … in seeking election to the Board.  Both during the campaign and if re-elected as a director, I will advocate

my views and urge the Board to get back on track and make decisions that are in the best interests of Xerox and our shareholders.

44.     On Monday December 11, 2017, Xerox issued a press release announcing

Christodoro's resignation, stating:

> Jonathan ***Christodoro***, former Managing Director of Icahn Capital LP, ***has resigned from the [Xerox Board] in order to allow Carl Icahn and his affiliated funds … to submit nominations for the election of director candidates*** at the 2018 Annual Meeting of Shareholders.

45.     Consistent with this announcement, shortly thereafter, Icahn filed documents with

the SEC to launch a proxy contest and nominate four director candidates to the Xerox Board,

including Christodoro.

46.     In the meantime, Fujifilm submitted its best and final offer regarding the

Transaction.  It would contribute its 75 percent interest in Fuji Xerox and receive a 50.1 percent

interest in Xerox.  Fujifilm also agreed to a $2.5 billion cash dividend to Xerox shareholders.

The parties then exchanged various informational requests and pursued due diligence, with the

aim of reaching agreement by late January 2018.

47.     In late December 2017, the parties continued to negotiate management of the

post-Transaction company.  Jacobson suggested in a text message to a Fujifilm executive that

Fujifilm communicate directly with the Xerox Board Chairman Keegan about the matter, to

avoid any conflict of interest.

48.     In January 2018, the parties continued their negotiations, working toward a

January 31, 2018 announcement.  This included three days of in-person management meetings

on January 8-10. Still outstanding in mid-January was resolution of issues relating to who would serve in management roles at the combined entity.

49.     On January 24, 2018, a week before the transaction was to be announced, the Chairman of the Xerox Board, Keegan, conducted a videoconference with Fujifilm's Chairman and Chief Executive Officer, Shigetaka Komori, during which each side conveyed its position on certain outstanding issues. Komori indicated that Fujifilm viewed the Transaction as attractive because of, among other things, the significant synergies Fujifilm expected the Transaction would generate. Komori further expressed the understanding that certain governance decisions were outstanding and could prevent the deal from being completed. Komori stated Fujifilm's preference that the new company have a co-CEO structure: Jacobson, from Xerox, and Go Miyazaki, an executive at Fujifilm. Fujifilm also proposed that the "continuing" directors from Xerox should have only a one-year term at the combined company, leaving the combined company free to find other independent directors if the need arose.

50.     Later that day, Keegan wrote Komori a follow-up letter regarding the outstanding governance issues. Keegan indicated that the Xerox Board had met to discuss the latest developments regarding the Transaction and that, as a result of those discussions, the Xerox Board had four requests in order for the Transaction to move forward:

   o  First, that Fuji Xerox provide prior to the close of the Transaction three years of audited financial statements materially consistent with certain prior information;

   o  Second, that Fujifilm acquiesce to Xerox's proposed management structure: Xerox sought to have one CEO (not the co-CEOs that Fujifilm proposed) and specifically for Jacobson to serve in that role;

   o  Third, and relatedly, that Xerox's continuing directors serve for a period of five years (not the one year Fujifilm proposed); and

   o  Fourth, Keegan made clear it was important to Xerox that, if announced, the Transaction would close, and wanted both parties to put forward every effort to

14

ensure it was completed.  This included an emphasis on obtaining regulatory approval.

51.     On January 27, 2018, Komori responded via letter noting a failure to complete the Transaction was a 'lose-lose' for both companies.  Komori accepted all four of the Xerox Board's requests, so long as the Transaction could be signed and announced on January 31, 2018.

52.     By January 31, 2018, the parties had resolved their outstanding issues and agreed to the Transaction, which was unanimously approved by the Xerox Board and Fujifilm board of directors.

### Mechanics of the Transaction and Its Public Announcement

53.     The Transaction was primarily memorialized in two legally binding and enforceable agreements entered into on January 31, 2018: the Redemption Agreement (the "RA") and the Share Subscription Agreement (the "SSA" and together with the RA, the "Transaction Agreements").

54.     The Transaction is complex, but features three key components:

o   *First*, existing Xerox stockholders (thus, excluding Fujifilm) will be issued a large, special cash dividend of $2.5 billion.  This $2.5 billion special dividend equates to roughly $9.80 per share based on Xerox's outstanding shares of common stock as of January 31, 2018 (or, almost one-third of the then-total value of the Xerox shares).

o   *Second*, pursuant to the RA, Fujifilm's 75 percent stake in Fuji Xerox will be acquired for cash by Fuji Xerox, consolidating ownership of Fuji Xerox as a wholly-owned subsidiary of Xerox Ltd.

o   *Third*, pursuant to the SSA, Fujifilm will use the cash received in exchange for its 75 percent stake in Fuji Xerox to purchase new shares of Xerox

common stock issued to it by Xerox amounting to 50.1 percent of the total Xerox common stock outstanding immediately following the Transaction.

55.     Xerox and Fujifilm also agreed to certain representations and covenants in the Transaction Agreements.

56.     Most fundamentally, Xerox and Fujifilm each agreed in the SSA that they would "cooperate with one another" and each "use its reasonable best efforts" to "take, or cause to be taken, all actions, and to do, or cause to be done… all things reasonably necessary, proper or advisable" to complete the Transaction.  (SSA § 5.01(a)).

57.     Xerox and Fujifilm also both agreed to "cooperate with one another" in, among other things, "the preparation of the XC Disclosure Documents"—meaning, the public filings Xerox would file with the SEC and/or disseminate to its shareholders "in connection with the Transaction[.]"  (SSA §§ 2.09(a); 5.01(b)).  Similarly, Xerox and Fujifilm agreed to "publicly support[]" the Transaction Agreements and the Transaction itself.  (SSA § 5.01(a)(v)).

58.     Xerox also made representations regarding the possibility of shareholder litigation relating to the Transaction.  Xerox agreed that, among other things, it "shall not consent to the entry of any judgment or enter into any settlement with respect to any such shareholder litigation without the prior written consent of [Fujifilm]," and it could only make payments or enter into a settlement if "the terms thereof are reasonably acceptable [to Fujifilm]."  (SSA § 5.08).

59.     Xerox and Fujifilm also both agreed that they could terminate the Transaction only under certain circumstances, including by mutual consent.  For example, Xerox was permitted to terminate if it entered into another "Acquisition Agreement," though such action would grant Fujifilm the right to demand payment of the "XC Termination Fee," defined as $183 million.  Xerox also had certain rights to terminate the Transaction if it did not receive certain financial statements for Fuji Xerox (*e.g.*, if certain Fuji Xerox audited financial statements

16

deviated in "any material respect" from previously provided, unaudited financial statements).
(SSA § 7.01(d)).  Fujifilm had the option to terminate the SSA if, among other things, Xerox
effected a "Change in XC Recommendation."  (SSA § 7.01(c)(i)(B)).  If Fujifilm terminates on
that basis, Xerox is required to pay Fujifilm the $183 million XC Termination Fee.  (SSA §
7.03(b)).

60.     On January 31, 2018, Xerox and Fujifilm issued a joint press release announcing
the Transaction.  That press release generally described the Transaction and also noted it was
"unanimously approved" by each company's board of directors and would require approval by
Xerox's shareholders.

61.     The January 31, 2018 press release further noted Xerox and Fujifilm's shared
belief that the Transaction was "highly synergistic" and was "expected to deliver at least $1.7
billion in total *annual* cost savings."  Of this $1.7 billion, the parties noted that they believed
"$1.25 billion is related to the synergies that will be achieved through the transaction."  Further,
the parties believed the new combined company would "have significant revenue synergy
opportunities over time."  This would later be documented as "at least $1.0 billion in revenue
expansion opportunities."

**Litigation Ensues**

62.     On February 13, 2018, two weeks after the Transaction was announced, Deason
filed a complaint alleging, among other things, that the Directors "negotiat[ed] and approv[ed] a
transaction that dramatically undervalues Xerox" and "if anything, disproportionately favors
[Fujifilm]."  *See Darwin Deason v. Fujifilm Holdings Corp.*, *et al.*, Index No. 650675/2018
(N.Y. Sup. Ct.).  Compl. ¶ 2.  Deason also claims that Fujifilm "aided and abetted" a breach of

fiduciary duty by negotiating the Transaction and "kn[owing] that the proposed Transaction disproportionately favored [Fujifilm] both on the economics and structure." *Id.* ¶¶ 92-93.

63.     Within days, four stockholder class actions were filed, which were consolidated in the same court hearing Deason's claims. *See In re Xerox Corp. Consol. Shareholder Litig.*, Index. No. 650766/2018 (N.Y. Sup. Ct.).

64.     In the meantime, at least initially, the parties to the Transaction Agreements began working toward closing the Transaction, as they are obligated to do under the Transaction Agreements.  Though Fujifilm would continue to use its best efforts to proceed with the Transaction, Xerox would soon begin acting otherwise.

65.     On April 10, 2018, Xerox filed a preliminary proxy statement with the SEC relating to its upcoming 2018 annual shareholders meeting (the "Annual Meeting Proxy Statement").  That proxy statement recommended that Xerox shareholders vote against Icahn's nominees to the Xerox Board because the Xerox Board believed that those nominees would "likely interfere with the Company's ability to effectuate the proposed transaction with Fujifilm successfully."

66.     In the meantime, the parties also exchanged myriad drafts of another preliminary proxy statement, which Xerox was obligated to prepare, related to a special meeting at which Xerox shareholders would vote on the Transaction (the "Special Meeting Proxy Statement").

67.     On or about April 12, 2018, Fujifilm communicated to Xerox that its auditors preferred to follow ordinary practice and sign the audit reports as of the date that Xerox would file its Special Meeting Proxy Statement.  Upon information and belief, Xerox's Chief Financial Officer assented to this approach.

68.     On April 13, 2018, Xerox received from Fujifilm draft financial statements and audit reports for Fuji Xerox, which did not differ in any relevant or material respect from the final audited versions, or from the prior, unaudited financial statements.

69.     On April 15, 2018, the parties exchanged version *33* of Xerox's draft Special Meeting Proxy Statement.  That version, last revised by Xerox's counsel, was nearly in final form for filing and mailing to Xerox shareholders.

70.     That same day, April 15, 2018, Fujifilm sent near-final versions of the same financial statements and audit reports for Fuji Xerox.  Per the communications to Xerox's CFO, these documents lacked only an auditor signature—because, as Xerox was aware, the auditors intended to sign the audit opinion to match the date that Xerox would file the Special Meeting Proxy Statement.

71.     On April 23, 2018, in a transparent attempt to back out of the deal to appease Icahn and Deason, Xerox sent Fujifilm a letter styled as a "Notice of Breach," in which Xerox manufactured claims that the Fuji Xerox financial statements were delivered late, but stopped short of attempting to terminate the Transaction or suggesting that the supposed breach was incapable of being cured.

72.     Indeed, in the April 23 letter, Xerox described it as "critical that the FX Initial Financials be delivered to Xerox as soon as possible."

73.     The next day, Xerox was provided the following by Fujifilm (thus curing any purported breach):  (i) the audited financial statements for FY 2017 and FY 2016 and the final dated and signed audit opinions relating thereto and (ii) the final unaudited financial statements for the nine months ended December 31, 2017 and 2016 together with a signed review report

issued by PwC.  These materials are substantively identical to those provided on April 15, 2018, except they reflect signatures from Ernst & Young and KPMG.

74.     By letter dated April 24, 2018, Fujifilm also provided Xerox with a detailed refutation of the misstatements contained in the letter Xerox sent on April 23.  Fujifilm informed Xerox that Fujifilm had satisfied all relevant obligations under Section 5.05(a) of the SSA.

75.     On April 27, 2018, the New York Supreme Court granted a preliminary injunction that prevented the Transaction from moving forward pending a final hearing on the merits.  *See In re Xerox Corp. Consol. S'holder Litig.,* Index. No. 650766/18 (Doc. No. 488 Apr. 27, 2018). The Court noted, however, that potential damages stemming from loss of the Transaction could be a "multi-billion dollar value" and required plaintiff Deason to post an undertaking of $150 million.  The Court held "only that plaintiffs have established the requisite for injunctive relief."[1]

76.     That same day, Xerox publicly filed copies of the audited financial reports that Fujifilm provided on April 24, 2018.

**Icahn and Deason Strike a Deal to Take Control of Xerox**

77.     Just days later, on May 1, 2018, Xerox publicly filed a "settlement agreement," which stated it was "in connection with, among other things, the following matters: (A) *Deason v. Fujifilm*[,] Index No. 650675/18 … and (B) *Deason v. Xerox Corp.*, Index No. 650988/18" (the "May 1 Settlement Agreement").  Xerox announced that the May 1 Settlement Agreement would become effective "upon execution by the [New York Supreme Court] of stipulations discontinuing the Deason litigations as to the Xerox Defendants" but noted the agreement would

---

[1]     In light of the New York Supreme Court's preliminary injunction order, Fujifilm does not seek specific performance at this time.  It fully expects that the state court will dissolve the preliminary injunction order (particularly because, as is mentioned below, both Deason and Xerox are now collectively seeking to altogether discontinue that litigation as to Xerox—the counterparty to the presently enjoined transaction).

"automatically terminate if the [New York Supreme Court] does not act before 8:00 PM EST on

May 3, 2018."

78.     The May 1 Settlement Agreement provided that Xerox would appoint six new

directors to its board (a board majority) while seven current directors were to resign.  It also

provided for CEO Jacobson's resignation.

79.     Of the six new directors proposed, at least five had significant connections to

Icahn or Deason:

> o   ***Keith Cozza*** is the Chief Executive Officer of Icahn Enterprises G.P. and Icahn
>     Enterprises L.P.  Until his resignation in early 2018, Cozza was also a director at
>     Herbalife Nutrition.
>
> o   ***Nick Graziano*** is a portfolio manager at Icahn Capital (another entity through
>     which Icahn manages investments) and is also a current director at Herbalife
>     Nutrition.
>
> o   ***Scott Letier*** is the Managing Director of Deason Capital Services, Deason's
>     family investment office.
>
> o   ***Jay Firestone*** is currently the head of Toronto-Based Prodigy Pictures.  He has
>     other ventures with Icahn (who, for example, recently also nominated him to
>     serve on the Lionsgate board of directors).
>
> o   ***Randolph Read*** is currently the CEO of Nevada Strategic Credit.  He too has
>     other ventures with Icahn (who, for example, recently nominated him to serve on
>     the SandRidge Energy Inc. board of directors).

80.     In exchange for appointing Icahn and Deason's chosen directors to a majority of

positions on the Xerox Board, (i) Deason agreed to settle his claims against Xerox and the

Directors while (ii) Icahn agreed to end his proxy contest in connection with Xerox's 2018 annual meeting.

81.     In conjunction with the May 1 Settlement Agreement, Xerox issued a press release, featuring a message from the "current Board of Directors of Xerox," which began:

> ***After careful consideration of shareholders' feedback on the proposed combination with Fuji Xerox, Xerox approached Fujifilm regarding a potential increase in consideration to be received by Xerox shareholders.*** As yet, Fujifilm has not made a proposal to enhance the transaction terms.
>
> Following the court's decision last week . . . the Board considered the significant risk and uncertainty of a prolonged litigation, during which the company would be prohibited from negotiating with Fujifilm, as well as the potential instability and business disruption during a proxy contest. ***As a result, the Xerox Board of Directors determined that an immediate resolution of the pending litigation and proxy contest is in the best interest of our company and all stakeholders***.

82.     This same press release foreshadowed the intended actions of the yet-to-be-empowered Xerox Board which, upon the settlement's effectiveness, would be comprised largely of Icahn's and Deason's designees.  Specifically, the press release noted that "[Xerox] has been informed that subsequent to the agreement becoming effective, the new Board of Directors plans to meet immediately to, among other things, begin a process to evaluate all strategic alternatives to maximize shareholder value, including terminating or restructuring Xerox's relationship with Fujifilm and the proposed transaction with Fujifilm."

83.     On May 3, 2018, the May 1 Settlement Agreement expired because the requisite stipulations were not executed.  Xerox announced the expiration, noting that "[a]s a result, the current Board of Directors and management team will remain in place.  Xerox and its Board of

Directors recognize the uncertainty caused by the developments of the past several days among the company's investors and other stakeholders."

<strong>Xerox Appeals the Preliminary Injunction Order<br>But Signals Its Intention to Walk Away</strong>

84.     On May 4, 2018, Xerox issued a press release titled "Xerox Files Appeal Against Court's Decision to Enjoin Fuji Xerox Combination."  In that notice, Xerox explained to its shareholders that it:

> ***strongly believes the decision is contrary to well-established New York law vesting the Board of Directors of Xerox with the business judgment to enter into the transaction agreement with Fujifilm*** (the "Transaction") and that the decision to approve should rest with Xerox's shareholders, not the Court.  The ***appeal disputes the court's finding that the Xerox Board breached their fiduciary duties in approving the Transaction.  To the contrary, the Xerox Board unanimously authorized the Transaction after months-long discussions and deliberations, and based on its good faith judgment that the Transaction represented the value-maximizing alternative for the company's shareholders.***

85.     On May 9, 2018, the Xerox Board issued another press release, in the form of a letter to Xerox shareholders.  It noted that the "events over the last few weeks – including the unexpected, adverse lower court ruling on April 27 and our ongoing disagreement with Carl Icahn and Darwin Deason – have caused uncertainty, and there is a great deal of misinformation in the marketplace."  The Xerox Board stated that it "intend[s]" to (i) "***Resume discussions with Fujifilm regarding a potential combination with Fuji Xerox on superior terms to the transaction announced on January 31***" and (ii) "***Pursue our appeal of the lower court's ruling in the Deason litigation, which we believe was wrongly decided and will be reversed***."

86.     The Xerox Board went on to explain that following a strategic review that began "in the fall of 2015," the Board pursued the Transaction because that was "what it believed was the most attractive option available, combining Xerox with Fuji Xerox.  ***We remain convinced that a combination of these companies is the most value-enhancing opportunity for Xerox.***

*The combination would, among other benefits . . . [d]eliver $1.7 billion in annual cost savings, including $1.25 billion in transaction synergies . . . .*"

87.     Further, the Board noted that since the Transaction was announced, Xerox's senior management has "had more than 100 meetings with investors, who clearly believe that: [t]here is a compelling strategic rationale for combining two longtime partners with synergistic competitive strengths; *[t]he board should secure improved financial terms to obtain shareholder support*; and [t]he recent financial performance and accounting issues at Fuji Xerox are important considerations in evaluating a potential combination."

88.     This announcement foreshadowed what would follow: a blatant disregard for Xerox's contractual obligations (*i.e.*, the Transaction Agreements) that, as Xerox announced just days earlier, "*the Xerox Board unanimously authorized . . . after months-long discussions and deliberations, and based on its good faith judgment that the Transaction represented the value-maximizing alternative for the company's shareholders.*"

**Xerox Purports to Terminate the Transaction**

89.     On May 13, 2018, Xerox sent Fujifilm a purported "Notice of Termination of the Transaction Agreements" (the "Purported Termination Letter").

90.     The Purported Termination Letter erroneously claims that Xerox may terminate the Transaction because (i) Fuji Xerox's audited financial statements purportedly differ materially from its unaudited financial statements and (ii) the required financial statements purportedly were not received by April 15, 2018.

91.     The Purported Termination Letter then reveals the true motivation for Xerox's termination, stating that "*we sought to engage with you on numerous occasions to improve the terms of the Transaction*[], including, among other instances (a) during the weeks of March 7

and April 11, when [Jacobson] traveled to Tokyo to meet with Mr. Komori and others; (b) on

April 24, in a video conference between Mr. Komori and Mr. Keegan, (c) on April 28, in a letter

from Mr. Keegan to Mr. Komori, and (d) on May 9 and 10, in discussions between our advisors

and [Fujifilm's] representatives and advisors. ***As you know, in our communications with you,***

***we requested a material increase to the consideration to shareholders of at least $1.25 billion***

***to be funded by [Fujifilm]***, changes to the Transaction Agreements to address the additional

accounting issues that have been identified and ensure effective accounting function and internal

controls on a go-forward basis.  We also demanded a prompt response by Fujifilm to document

these proposed changes to [the Transaction]."  Xerox's letter went on to conclude that "[b]ased

on the foregoing, we do not believe the Transactions can be consummated on the current terms

set forth in the Transaction Agreements."

92.     The Purported Termination Letter made clear that Xerox would not honor its

contractual obligations under the Transaction Agreements, thereby depriving investors in

Fujifilm and Xerox of the billions of dollars in synergies that both parties expected the

Transaction to produce in the coming years.

93.     Further events of May 13, 2018 leave no doubt that Xerox's purported

termination was pretextual. ***Just half an hour later***, Xerox ***yet again*** entered into a settlement

agreement among itself, Deason, Icahn (and others affiliated with each of them), and

Xerox's current and future directors (the "May 13 Settlement Agreement").

94.     The May 13 Settlement Agreement effectuated a corporate takeover, granting five

of Icahn and Deason's nominees positions on the Xerox Board and providing for the resignation

of six Xerox directors (including its CEO, Jacobson)—all for the second time in two weeks.  As

of 5:30 p.m. on May 13, the May 13 Settlement Agreement required Xerox to, among other

things, appoint Christodoro, Letier, Cozza, Graziano, and Giovanni Visentin to the Xerox Board, and accept the resignation of six existing directors, including Jacobson.

95.     Oddly, while the May 13 Settlement Agreement designates Cozza and Graziano as "Icahn Designees" and Letier as the "Deason Designee," Christodoro is listed as the "New Independent Director"—apparently seeking to mask his long time affiliation with Icahn, who had previously designated Christodoro as his representative on the Xerox Board as part of the June 27, 2016 standstill agreement with Xerox.  Upon information and belief, Christodoro continues to have a senior position at Icahn Capital, L.P.

96.     The May 13 Settlement Agreement further provided that, beyond these immediate changes in Board composition, the slate of nominees at the Xerox 2018 annual shareholder meeting "is required to consist only of the following individuals: Jonathan Christodoro, Scott Letier, Keith Cozza, Nicholas Graziano, Giovanni (John) Visentin, Sara Martinez Tucker, Gregory Q. Brown, Joseph J. Echevarria, and Cheryl Gordon Krongard."

97.     Thus, the May 13 Settlement Agreement sought to ensure that the Xerox Board is comprised of many individuals with longstanding connections to Icahn and Deason for at least the next year, effectively granting Icahn and Deason control of the Xerox Board for no consideration whatsoever.  Indeed, upon information and belief, the May 13 Settlement Agreement does not provide for the payment of any compensation to Xerox shareholders, including Deason.

98.     Xerox's website reflects that certain immediate changes in board composition have taken place.  It states, among other things, that Keith Cozza is Chairman of the Xerox Board.  It also notes his status as the current CEO of Icahn Enterprises, L.P.

99.     On May 21, 2018, Xerox and Deason filed a brief in support of a discontinuance of their litigation in New York Supreme Court *except* as to Deason's claim against Fujifilm for allegedly aiding and abetting breaches of fiduciary duty.  For support, Xerox and Deason pointed to the May 13 Settlement Agreement and claimed the Xerox Board deemed the settlement "in the best interest of Xerox shareholders."

100.    Upon information and belief, as of this filing, despite the multitude of public announcements about the Transaction, no superior third-party bid for Xerox has emerged since the Transaction was announced.

101.    Nevertheless, at present, Xerox has renounced its obligations under the Transaction Agreements, depriving Fujifilm and Xerox shareholders of the significant benefits they would otherwise receive.  This includes, among other things, the billions of dollars in synergies that both parties expected and publicly disclosed to Fujifilm and Xerox shareholders.

## CLAIMS FOR RELIEF

### COUNT I:  BREACH OF CONTRACT –
### PRETEXTUAL TERMINATION

102.    Fujifilm hereby incorporates by reference the allegations set forth in paragraphs 1-101 above as if fully set forth herein.

103.    Xerox purports to have terminated the Transaction Agreements based upon assertions that the consolidated financial position of Fuji Xerox were untimely delivered and materially deviate from unaudited financial statements previously delivered.

104.    These purported reasons for termination, as set forth in Xerox's May 13, 2018 Purported Termination Letter, are false and purely pretextual.  As Xerox does not have the right

to terminate the Transaction, its effort to terminate is ineffective and the Transaction Agreements remain in place.

105.    The true reason for Xerox's purported termination of the SSA and RA is the simple truth that the Xerox Board changed its mind—as induced by Deason and Icahn.

106.    Accordingly, Xerox breached, among other things, Section 5.01(a) of the SSA, which requires it to "cooperate" and "use its reasonable best efforts" to cause the conditions precedent of the Transaction to be fulfilled and the Transaction consummated and to "publicly suppor[t]" the same.  Insofar as Xerox has sought to terminate the Transaction Agreements without basis, it has failed to use its best efforts to comply with these agreements.  Its many public statements unilaterally advocating for a change in terms and various related breaches of the Transaction Agreements only support this finding.

107.    Moreover, Xerox's breach of Section 5.01(a) constitutes a Willful Breach of the SSA.  Pursuant to Section 7.02 of the SSA, Fujifilm is entitled to seek money damages for any "Willful Breach."

108.    The SSA defines "Willful Breach" as "an intentional and willful breach, or an intentional and willful failure to perform, in each case that is the consequence of an act or omission by a party with the actual knowledge that the taking of such act or failure to take such action would cause a material breach of this Agreement or the Redemption Agreement."

109.    Xerox's Purported Termination Letter—founded on wholly baseless and pretextual assertions—and related public statements were plainly intentional and willful, and therefore constitute a Willful Breach as that term is defined in the SSA.

110.    As a result of this Willful Breach, Fujifilm has been damaged in an amount to be determined at trial, but estimated to exceed $1 billion.

## COUNT II:  BREACH OF CONTRACT –
## SETTLEMENT WITHOUT NOTICE OR CONSENT

111.    Fujifilm hereby incorporates by reference the allegations set forth in paragraphs 1-110 above as if fully set forth herein.)

112.    Section 5.08(b) of the SSA provides that "[Xerox] *shall,* to the extent reasonably practicable, *consult with [Fujifilm] regarding the defense, settlement or prosecution of any such shareholder litigation*."

113.    Section 5.08(c) of the SSA provides that "[Xerox] *shall not consent to* the entry of any judgment or enter into *any settlement with respect to any … shareholder litigation without the prior written consent of [Fujifilm]*…."

114.    Xerox has committed at least two Willful Breaches of these provisions.

115.    First, Xerox entered into the May 1 Settlement Agreement, which expired on May 3, 2018 (because the New York Supreme Court did not execute stipulations of dismissal by that time).

116.    Xerox did not provide any prior notice of the May 1 Settlement Agreement to Fujifilm, consult with it about the May 1 Settlement Agreement, or seek Fujifilm's consent thereto, and thereby committed a Willful Breach of Sections 5.08(b) and 5.08(c).

117.    Following announcement of the May 1 Settlement Agreement, Fujifilm informed Xerox that it considered entry into the May 1 Settlement Agreement without Fujifilm's consent to be a breach of Section 5.08 of the SSA.

118.    Nevertheless, Xerox soon breached this provision again.  As discussed above, shortly after 5:00 pm on Sunday, May 13, 2018, Xerox sent Fujifilm the Purported Termination Letter via facsimile.  Just minutes later, effective 5:30 p.m., Xerox entered into the May 13 Settlement Agreement.

29

119.   Yet again, Xerox neither provided Fujifilm with advance notice of the May 13 Settlement Agreement nor sought Fujifilm's consent.

120.   Indeed, Fujifilm did not learn of the May 13 Settlement Agreement until Xerox announced it to the public.

121.   Xerox's decision to proceed with the May 13 Settlement Agreement without notice to or consent from Fujifilm was in blatant disregard of its contractual obligations and a Willful Breach of Sections 5.08(b) and (c) of the SSA.

122.   Xerox's decision to enter into a second such arrangement just 12 days later, fully aware that Fujifilm viewed the May 1 Settlement Agreement as a Willful Breach of the SSA, underscores Xerox's willful disregard of its contractual obligations.

123.   As a result of this Willful Breach, Fujifilm has been damaged in an amount to be determined at trial, but estimated to exceed $1 billion.

## COUNT III:  BREACH OF THE IMPLIED
## COVENANT OF GOOD FAITH AND FAIR DEALING

124.   Fujifilm incorporates by reference the allegations set forth in paragraphs 1-123 above as if fully set forth herein.

125.   Xerox has also breached the implied covenant of good faith and fair dealing that is embedded in the Transaction Agreements.

126.   It is plain that the parties intended for the Transaction Agreements to be fulfilled and for the Transaction to close.

127.   Xerox's Purported Termination Letter is a false and pretextual effort to evade its contractual obligations under the Transaction Agreements simply because it has changed its proverbial mind on a *post hoc* basis to satisfy Icahn and Deason.

128.    Xerox's public statements corroborate this conclusion.  For example, Xerox's May 9, 2018 press release noted the Xerox Board's intention to "[r]esume discussions with Fujifilm regarding a potential combination with Fuji Xerox on superior terms to the transaction announced on January 31."  The Purported Termination Letter's note that Xerox "sought to engage with [Fujifilm] on numerous occasions to improve the terms of the Transaction[]" proves the point.

129.    In sending the Purported Termination Letter, Xerox has sought to prevent performance of the Transaction Agreements and withhold their benefits from Fujifilm.

130.    Xerox has, therefore, deprived Fujifilm of the right to receive the benefits of the bargain that it struck.

131.    As a result of this Willful Breach, Fujifilm has been damaged in an amount to be determined at trial, but estimated to exceed $1 billion.

## COUNT IV:  DECLARATORY JUDGMENT
## REGARDING CHANGE IN XC RECOMMENDATION

132.    Fujifilm incorporates by reference the allegations set forth in paragraphs 1-131 above as if fully set forth herein.

133.    Section 4.03(d)(A) of the SSA provides that the Xerox Board shall not *either* "fail to include in the Proxy Statement, or withdraw or modify, in any manner adverse to [Fujifilm], the XC Recommendation[.]"  Relatedly, 4.03(d)(D) prohibits Xerox from "publicly propos[ing] or announc[ing]" an "intention" to fail to do any of the foregoing.

134.    Section 5.04(d) of the SSA defines the "XC Recommendation," and states that "Except to the extent expressly permitted by Section 4.03, the [Xerox] Board shall recommend

that [Xerox]'s shareholders vote in favor of the Applicable Shareholder Approvals at the XC

Shareholder Meeting (the "XC Recommendation")…."

135.    On April 10, 2018, Xerox filed the Annual Meeting Proxy Statement.

136.    The Annual Meeting Proxy Statement provided, among other things, that "on

January 31, 2018, we entered into a definitive agreement with [Fujifilm] to combine with [Fuji

Xerox] — the joint venture that Xerox and Fujifilm established in Asia 56 years ago — to create

a global leader in innovative print technologies and intelligent work solutions. Our proposed

combination with Fuji Xerox is a result of a comprehensive review of the Company's strategic

and financial alternatives conducted by Xerox's Board and management team. We are focused

on creating value for our shareholders, and we strongly believe that the combination with Fuji

Xerox is the best path forward for our company. We plan to file a separate proxy statement in the

near future in connection with the special meeting at which you will have the opportunity to vote

on matters related to our proposed transaction with Fujifilm."

137.    The Annual Meeting Proxy Statement also contains a section titled "Background

of the Solicitation."  It includes a more than 10-page, single-spaced description of Xerox and

Fujifilm's interactions related to the Transaction.

138.    The Annual Meeting Proxy Statement expresses the views of Xerox' Corporate

Governance committee regarding Icahn's nominees.  This includes that:

> The Corporate Governance Committee reviewed Icahn's proposed nominees and
> has determined, based upon its review of biographical and other information with
> respect to the nominees provided by Icahn and obtained through public records,
> that none of the four nominees possessed backgrounds, skills or expertise that were
> additive or superior to those of the existing Board members. ***The Corporate
> Governance Committee further considered the close association of the Icahn
> Nominees with Mr. Icahn and Mr. Icahn's opposition to the proposed transaction
> with Fujifilm and calling for the termination of the Fuji Xerox joint venture and
> the Board's view that the proposed transaction with Fujifilm and the current Fuji
> Xerox joint venture are in the best interests of the Company's shareholders***.

Based on such considerations, the Corporate Governance Committee further determined that the Icahn Nominees were inherently conflicted, as evidenced by their willingness to be Icahn's nominees in a proxy fight launched during the same time as Mr. Icahn had expressed such views and that ***nominating any of the Icahn Nominees would likely interfere with the Company's ability to effectuate the proposed transaction with Fujifilm successfully.***

139.    "Based on" these conclusions, the Xerox Board did not include Icahn's nominees in its slate of director nominees at the Xerox 2018 annual shareholders meeting.

140.    The Xerox Board then reversed its position altogether, abandoning its support for the Transaction and instead concentrating its efforts on settling its dispute with Deason and Icahn via the May 1 Settlement Agreement and May 13 Settlement Agreement (thereby promising to appoint Icahn and Deason's selected candidates immediately and limit the nominees of the incumbent Xerox directors at the 2018 annual meeting to a similar pre-selected group), and, secondarily, seeking to re-negotiate its Transaction with Fujifilm.

141.    Upon information and belief, Icahn and Deason were only interested in settling with Xerox if Xerox could (i) free itself from the so-called "no-shop" provision in Section 4.03 of the SSA (which gives Fujifilm certain rights with respect to competing transactions from third parties) and (ii) avoid its obligation to pay the $183 million termination fee that Fujifilm could elect to receive if Xerox rescinded its recommendation to support the Transaction.

142.    This fact was laid bare in Deason and Icahn's joint statement to shareholders dated May 10, 2018, in which they stated they had "been approached by pretty much every major financial sponsor, and they have all expressed interest in Xerox.  But none of them are willing to invest the resources necessary to fully diligence the opportunity until the proposed Fuji deal is

terminated, the risk of having to pay a $180 million break-up fee to Fuji is eliminated, and the existing directors – each of whom they know already has one foot out the door – are replaced."

143.    Upon information and belief, Xerox knew the only way to satisfy Deason and Icahn's requirement—that Xerox seek to terminate the SSA without triggering the XC Termination Fee—was to conceal the true reason for termination.

144.    Xerox's very public conduct sent a message to shareholders that Xerox was walking away from the deal to pursue other transactions—even as Xerox adopted and clung to the fiction that it was terminating the Transaction Agreements for reasons related to the Fuji Xerox financial statements.

145.    To the extent the Annual Meeting Proxy Statement satisfied Xerox's obligation to "include in the Proxy Statement… the XC Recommendation," Xerox then breached Section 4.03(d) of the SSA by withdrawing or modifying the XC Recommendation.

146.    Moreover, Xerox has not filed the Special Meeting Proxy Statement even though Section 5.04(a) of the SSA requires Xerox to file it "as soon as reasonably practicable" after Xerox received the financial statements of Fuji Xerox—which Xerox received in April from Fujifilm.

147.    By failing to file the Special Meeting Proxy, Xerox has failed in its contractual obligation to "recommend that [Xerox]'s shareholders vote in favor of the Applicable Shareholder Approvals at the XC Shareholder meeting" or "use its reasonable best efforts to obtain from its shareholders proxy in favor of the Applicable Shareholder Approvals."

148.    Xerox, therefore, has alternatively breached Section 4.03(d)(A) of the SSA by failing "to include in the Proxy Statement . . . the XC Recommendation."

149.     Accordingly, Fujifilm seeks a judgment pursuant to 28 U.S.C. § 2201(a) declaring that Fujifilm is entitled to the option of terminating the SSA and obtaining consequential relief—specifically, the right to elect to receive the XC Termination Fee ($183 million).

**PRAYER FOR RELIEF**

WHEREFORE, Fujifilm prays for relief and judgment including:

a)      awarding damages in favor of Fujifilm and against Xerox in an amount to be determined at trial but estimated to exceed $1 billion;

b)      further, awarding punitive damages in light of Xerox's Willful Breaches of the Transaction Agreements;

c)      issuing a declaration that a Change in XC Recommendation has occurred pursuant to the SSA thereby giving Fujifilm the option to elect to terminate the Transaction and obligating Xerox to pay Fujifilm the $183 million XC Termination Fee, among other remedies;

d)      reimbursement of Fujifilm's costs and expenses incurred in this action, including its attorneys' fees; and

e)      such other and further relief as the Court may deem just and proper.

Dated: June 18, 2018
      New York, New York

SIDLEY AUSTIN LLP
Andrew W. Stern
 astern@sidley.com
Nicholas P. Crowell
 ncrowell@sidley.com
Alex J. Kaplan
 ajkaplan@sidley.com
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300

MORRISON & FOERSTER LLP
James E. Hough
 jhough@mofo.com
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000

*Attorneys for Fujifilm Holdings Corp.*

36